FORET, Judge.
This suit was brought by plaintiff, Yvonne Youngblood, widow of Dalton R. Youngblood, individually and as tutrix of her minor son, Michael (who was 16 years of age at the time of his father’s death, but who reached the age of majority on September 25, 1983), for worker’s compensation death benefits as a result of the death of Dalton R. Youngblood against defendants, Rotor Aids, Inc. (Rotor Aids), Wausau Underwriters Insurance Company (Wau-sau), and Evergreen Helicopter Company, Inc. (Evergreen). After trial on the merits, the trial court rendered judgment denying benefits, finding that decedent suffered from “significant cardiovascular disease.” Plaintiff has appealed from that decision. The sole issue raised by this appeal is whether or not decedent’s heart attack was causally related to occupational stress.
FACTS
Dalton R. Youngblood died of a heart attack on July 9,1982, while employed as a helicopter pilot by Rotor Aids. He was 49 years old and a Viet Nam veteran. Young-blood had been working for Rotor Aids since 1976. He worked seven days on and seven days off. During the seven days on, he was on 24-hour call and lived in a trailer provided by his employer. Youngblood’s work duties entailed ferrying passengers *134 and cargo from Rotor Aids’ base, near In-fracostal City, to offshore oil platforms. He averaged five air hours per day[1].
In September of 1981, Youngblood slipped on an offshore helipad and injured his back, requiring surgery in March, 1982[2]. After convalescing for more than two months, he returned to work in early June, 1982. Youngblood was required to wear a back brace; therefore, Rotor Aids did not want him to fly the ferry helicopters because passengers were reluctant to fly with a man in a brace. Rotor Aids assigned Youngblood to maintenance flights and clerical duty.
Youngblood worked one complete hitch and four days of the second hitch before suffering a fatal heart attack. During the first hitch, decedent was goaded frequently and seriously by fellow pilots because they claimed decedent “was drawing full pay, but not carrying his load.” The day before his fatal heart attack, decedent flew his first maintenance flight since his surgery in March, 1982.
The death certificate indicates the autopsy revealed atherosclerosis, 90% thickening of the left coronary artery and scarring of the left ventricular wall.
HAS CLAIMANT’S BURDEN UNDER LA.R.S. 23:1031 BEEN CARRIED?
“The requirements for a successful claim for worker’s compensation as set out in La.R.S. 23:1031 are as follows:
If an employee ... receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated. (Emphasis supplied.)”
Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626, 628 (La.1982).
The first prong of La.R.S. 23:1031 dictates that “an accident occurs in the course of employment when it happens during the time of employment and at a place contemplated by the employment.” Guidry, id. and cases cited therein.
There is no question that the heart attack occurred “in the course of” Young-blood’s employment. Decedent was on 24-hour call and lived in a trailer provided by his employer. Although he was granted permission to take July 9 off, he was undisputably engaging in an authorized rest period. Guidry, supra; Smith v. Walker, 35 So.2d 766 (La.App. 2 Cir.1948); St. Alexandre v. Texas Company, 28 So.2d 385 (La.App.Orl.Cir.1946). Not having a heart attack during regular daytime working hours does not preclude an award of benefits. Neelley v. New Orleans Shipyard, Inc., 463 So.2d 32 (La.App. 5 Cir.1985); Barnes v. City of New Orleans, 322 So.2d 821 (La.App. 4 Cir.1975), writ refused, 325 So.2d 584 (La.1976); Wood v. Amstar Corp., 380 So.2d 735 (La.App. 4 Cir.1980). Thus, the first prong of R.S. 23:1031 has been satisfied.
The second prong requires that the accident “arise out of the employment.” “Arise out of the employment” has been interpreted to require “the accident’s being the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed.” Guidry, supra, at 628. Additionally, “this risk of employment from which injury resulted should be one greater than that occasioned by a person not engaged in the employment.” Guidry, supra, at 629[3].
*135 Heart attacks satisfy the statutory requirement of personal injury by accident. Guidry, supra, and cases cited therein. Although heart attacks are partly related to the employee’s personal physical condition, they are nevertheless personal injury by accident. Additionally, an employer must “take a worker as he finds him.” Behan v. John B. Honor Company, Ltd., 143 La. 348, 78 So. 589 (1918); Chism v. Kaiser Aluminum and Chemical Corp., 332 So.2d 784 (La.1976); Guidry, supra.
A heart accident must be causally related in part, however slight, to the employment. Guidry, supra. When a claim is advanced that mental and emotional stress precipitated the accident, the claimant must show that the vascular accident was produced by extraordinary mental and emotional stress related to his employment. McDonald v. International Paper Company, 406 So.2d 582 (La.1981). A claimant must present evidence of medical causation. Guidry, supra, page 633, footnote 16; Schneider v. Strahan, 449 So.2d 1338 (La.1984).
In this case, the trial court exclusively deferred, on the causation issue, to the testimony of Dr. Glenn Larkin, a forensic pathologist. Dr. Larkin performed the autopsy on Youngblood and stated that regardless of Youngblood’s occupation, he would have had a heart attack sooner or later because of his condition. Apparently the trial court believed that this medical testimony was sufficient to deny compensation. However, the trial court did not distinguish between legal and medical cause. We are concerned here with legal cause. “Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence.” Hammond v. Fidelity & Casualty Company of New York, 419 So.2d 829 (La.1982). The trial court further ruled that all helicopter pilots are under stress and therefore the stress Youngblood experienced was not significant.
Clearly, the trial court erred because it matters not that the heart attack could have occurred at another place and time. Roussel v. Colonial Sugars Co., 318 So.2d 37 (La.1975). The court also erred in comparing Youngblood’s stress to that of other pilots since the correct standard enunciated in Guidry v. Sline Industrial Painters, Inc., supra, is that the comparison be made between the stress associated with the claimant’s job duties and that involved in everyday non-employment life.
To satisfy the causal connection, it is only necessary that the heart attack be caused, precipitated, or contributed to by the exertion, stress, or other factors directly connected with the employment. Parks v. Insurance Company of North America, 340 So.2d 276 (La.1976); McDonald v. International Paper Co., supra. In Guidry, the Supreme Court concluded that a heart attack to be compensable must be causally related in part, however slight, to the employment. (It is virtually impossible to conclusively prove or disprove work-related causation in heart accidents where the medical evidence shows pre-existing cardiovascular disease, as in this case.) Kostamo v. Marquette Iron Mining Co., 405 Mich. 105, 274 N.W.2d 411 (1979). The evidence at trial must show only a reasonable possibility of causal connection between the accident and the death or disabling condition. Hammond v. Fidelity & Casualty Company of New York, supra.
Atherosclerosis is an ordinary disease not caused by work or aggravated by stress of work but, stress that would not normally affect a person without atherosclerosis may cause a person who has this disease to have a heart attack. Certainly heart attacks are inevitable in the sense that the victim will, at some point, have a heart attack, but such a statement begs the question of whether job stress caused the attack to occur when it did or aggravated the attack and the extent of the damage. A New Standard for Cardiovascular Claims in Workers’ Compensation, 43 La.L.Rev. 17 (1982); Kostamo v. Marquette Iron Mining Co., supra. Worker’s compensation is not payable for ordinary diseases but does *136 compensate work-related acceleration and aggravation of such diseases.
Stress contributes to heart disease. Pressure created by one’s job environment is one of the most common causes of stress. Scott v. Ins. Co. of North America, 485 So.2d 50 (La.1986). Various stresses may cause attacks, including anxiety, anger, fear, exhilaration, fatigue, and the environment. It is medically impossible to determine whether a particular stress caused a particular injury. Nonetheless, an assessment of the probabilities of the heart attack in light of the background factual circumstances and opinion testimony aid in the determination of whether or not compensation may be awarded. Id., see especially medical studies cited therein.
The factual issue concerns the working and other conditions of the claimant’s life which are alleged to constitute the stress that assertedly led to the heart attack. In other words, did the asserted stress cause the heart attack?
This factual question clearly does not require medical testimony. Our Supreme Court, in Haughton v. Fireman’s Fund American Ins. Co., 355 So.2d 927 (La.1978), and in Hammond v. Fidelity & Casualty Co. of New York, supra, intimated that causation remains the province of the courts, not to be decided exclusively on the basis of the medical testimony. Such a pronouncement avoids the battle of the experts; plaintiff finds a doctor who will testify that definitely the job-related stress more likely than not caused the heart attack, whereas the defendant will locate a physician with a diametrically opposed viewpoint. The most truthful statement that the medical profession can make regarding causation and heart attacks is just as Dr. Larkin stated in this case, that job-related stress could have contributed to the heart attack and may have accelerated its occurrence. The answer to the causation problem can be found in careful scrutiny of the factual background. It was error for the trial court to give preclusive effect to the medical testimony of Dr. Larkin.
His brother testified that Dalton was very much the “macho” type. While Dalton was serving in Viet Nam as General Westmoreland’s personal pilot, the General nicknamed him “Duke” after no less a personage than the late John Wayne. We mention this fact to illustrate the added stress Dalton was undergoing as a result of his recent injury.
Johnny Ed Howe and Donald Bordelon, who testified by deposition, were Young-blood’s supervisors and described the work schedules, duties, and responsibilities of helicopter pilots employed by Rotor Aids. Rotor Aids employs approximately 35 pilots, half of whom work a seven-day hitch and the remaining would work the following seven-day hitch. Rotor Aids provided sleeping quarters for the pilots in close proximity to the base of operations at In-tracoastal City. Because of the longer daylight hours during the summer months, pilots had more actual flight time, as flying would begin at sunup and terminate at sundown. The pilots were on 24-hour call. Pilots were to return to their living quarters at day’s end or they could leave the living quarters provided they stayed within commuting distance and left a number where they could be reached in the event they were needed.
The Rotor Aids pilots averaged 5 hours flying per day. Johnny Ed Howe testified that piloting a helicopter is similar to riding in an automobile without shock absorbers — obviously a stressful occupation.
In September of 1981, Youngblood slipped and fell while getting out of a helicopter onto an offshore platform and injured his back, requiring extensive surgery in March of 1982. Two and one-half months after surgery, in early June, Youngblood returned to work. He was required to continue wearing his back brace and was given administrative and clerical duties. Although not flying to the offshore platforms, he continued to draw full pay. Consequently, the other pilots began to goad him because he was not carrying his load.
*137 Youngblood was extremely disturbed by this razzing. He discussed the problem with his wife several times on his off weeks and even mentioned it to his supervisor and his brother the night before his death. Johnny Ed Howe, Youngblood’s supervisor, admitted that the harassment had gotten out of hand and that he had to speak with the pilots and ask them to stop.
Youngblood had flown a short maintenance flight the Thursday prior to his heart attack on Friday morning at 3:00 A.M. The last person seeing Youngblood alive was his brother, Donald. They dined together Thursday night, at which time they discussed the anxiety and worry that Youngblood was experiencing as a result of the goading by other pilots.
Youngblood, aware of the pounding his back would take when flying the helicopter, was fearful that his' back would not be able to stand up to the test when called upon. He was concerned about being able to keep his job in light of his injury.
Dr. Glenn Larkin, the pathologist performing the autopsy, testified that decedent suffered from atherosclerosis and that the left coronary artery had 90% narrowing. Dr. Larkin testified that he could not state definitively what had caused the heart attack but stated that stress of the nature Youngblood was subjected to could be a contributing cause of the fatal heart attack.
We believe that claimant has satisfied the test in Guidry, supra, in light of the testimony which indicated that the employment stresses Youngblood was subjected to could be a contributing cause to the heart attack. Our courts have been liberal insofar as finding sufficient the amount of stress or exertion which has contributed to a given heart accident. Guidry, supra, at 632. In Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109-110, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959), the United States Supreme Court addressed the role of medical testimony in a compensation action under the Jones Act. In Sentilles, the court rejected the proposition that causation between a physical condition and external conditions could not be established in any other way except by the testimony of a medical expert. Our Supreme Court approved this legal precept in Hammond, supra.
The slip and fall accident which resulted in surgery in March arose out of and in the course of Youngblood’s employment with Rotor Aids, as did the significant razzing by fellow pilots. We conclude that such work stress in reasonable probability contributed in some degree to the heart accident. The fact that Youngblood flew on a maintenance flight the day before his heart attack indicates that Youngblood was subjected to considerable more stress, connected with his employment, than any stress generated in everyday non-employment life for him.
For the foregoing reasons, the judgment of the trial court is hereby reversed and set aside, and judgment is rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Yvonne Youngblood, individually and on behalf of her son, Michael Youngblood, the latter being a minor at the time of the death of his father, but who is now a major, for such worker’s compensation benefits as are recoverable under law as it existed at the time of decedent’s death, including medical and/or burial expenses, together with legal interest thereon, all in accordance with law;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs incurred in the trial court and in this Court are assessed against defendants.
REVERSED AND RENDERED.

. At the time of death, decedent's brother, also a pilot, estimated that decedent had accumulated eight to ten thousand air hours. Mrs. Young-blood testified that decedent loved to fly.

. This claim was submitted as a worker’s compensation claim but was denied because decedent gave verbal, as opposed to written, notice of the claim to his supervisors.

.This standard has been criticized as having “the effect of finding all but perhaps office and sedentary employment to be sufficiently stressful to present a prima facie case for the plaintiff that the heart attack arose out of the employment.” Juge and Phillips, "A New Standard for Cardiovascular Claims in Workers’ Compensation”, 43 L.L.R. 17, 42 (1982).